United States v. Mensah. Good morning, your honors. May it please the court. My name is Richard Washington, and I represent the defendant appellant, Enoch Mensah, in this appeal. Mr. Mensah was convicted of healthcare fraud and public benefits theft following a jury trial, wherein the prosecution improperly commented on his right to remain silent. This was a trial in which one of the jurors knew one of the arresting officers. And thereafter, following the trial, Mr. Mensah was sentenced to 42 months, based in part upon a loss amount that we contend was largely speculative. This was Mr. Mensah's first appeal, I mean this was his first conviction, and we've raised really just three issues on this appeal. The first one being that the juror that was permitted to remain on the jury during the trial once it came to light that he knew one of the government's witnesses. It's our position that that juror should have either been dismissed or that further inquiry should have been conducted by the trial court, the lower court. Our second contention is that the prosecution, the government engaged in prosecutorial misconduct when they made reference to Mr. Mensah's right to testify during the cross-examination of a government witness. And our third contention is that the loss amount which was used to determine Mr. Mensah's death was largely speculative based upon the fact that it included multiple instances wherein Mr. Mensah was not observed, but was based solely upon the positioning of his vehicle, the positioning of him using the phone more than 15 minutes, and things of that nature. It was based upon instances where there was no direct identification of Mr. Mensah. So just moving through that as it relates, starting with the juror issue, we're operating under the presumption that in order to satisfy his burden in this matter, he must first establish two things as set forth in Greer. That the juror failed to honestly answer a material question on voir dire. We acknowledge that magistrate Judge Ornstein provided the prospective jurors with the names of all of the government's witnesses. We do not contend that the government did not provide those witnesses. However, once it came to light that this juror knew one of the government's witnesses, it's our position that the investigation or the voir dire, the questioning into this witness was far too short, far too abbreviated. It's our position that- So why is that? I mean, I guess the district court made an inquiry of the law enforcement agent who said, there's no relationship, but I recognize juror number six. And juror number six leads with, there is no relationship. So we had confirmation that there's no relationship. What else should the district court have inquired into? Well, I think at a minimum, the district court could have asked, for example, if he was even aware of the witness's name. And if he was, why he had not disclosed that during voir dire when that information was presented. Why would that have mattered if there was no relationship? Well, I think it would have given the defense council a more adequate opportunity to voir dire or to request voir dire on that witness, or even to challenge that witness for cause. But what would be the cause? Well, I do believe that if we were to learn, for example, that this witness had known one of the government's witnesses based upon the fact that the witness's sister lived with the witness, the juror's sister lived with the witness's wife, girlfriend at the time, in college, I think there are questions that may be relevant as to how often he sees this witness, whether he's spoken to this witness about- Meaning, but wouldn't that be effectively to probe whether they had a relationship? Yes, Your Honor. But if, again, so I guess what's happening is you have a statement by both parties. We didn't have a relationship. The judge credited that. And you're saying that you should have had a chance, or not you, but whoever was counsel at the time, needed an opportunity to basically cross-examine presumably both of them? Well- Why not both of them at that point? Well, I think both of them could have been- And just assume that they were both lying when there was no evidence to indicate that they were lying? Well, no, Your Honor. I don't think that, it's not my suggestion that they were lying by any stretch of the imagination. More so, my suggestion is that, based upon their knowledge of one another, the fact that they were acquainted with one another in the past, and presumably had been so for several years, that this is one of those instances where the nature of their affiliation, let's not call it a relationship, but their acquaintance with one another was such that bias could be implied to that specific witness. And given that the trial had already started at the point that this came to light with regard to the juror being acquainted with the government witness, would have been an opportunity for the trial court to simply dismiss that juror, allow one of the three alternates that they had to remain on the jury, and just to ensure that the jury was impartial. Would you mind taking a little bit of your time just before you run out? Yes, sir. Can you address your argument about the prosecutor's comment regarding your client's- Yes, regarding his- Comment on his right to testify. Absolutely. I know that in the government's brief, it's their position that the parties were involved in an antagonistic cross-examination. I saw nothing of the sort from my review of the transcripts. It seemed to me as if that was a gratuitous statement that was directed specifically at Mr. Mintz's right to testify in that- Hang on, a gratuitous statement aimed at that. You're suggesting that the prosecutor was purposely trying to comment on the defendant's failure to testify? because when I read the transcript, it seemed more like the cross-examination was deliberately trying to elicit inadmissible hearsay statements by a client. And it was an inartfully, very inartfully worded objection. Shouldn't have been worded that way at all. But had the prosecutor stood up and said hearsay, that would have been a 100% correct objection, right? I believe that 100%, Your Honor, and I think that- So you're just saying that the wording, you're suggesting that the prosecutor was deliberately trying to violate your client's Fifth Amendment rights? I'm suggesting that the prosecutor is very skilled. I'm suggesting that the prosecutor is very knowledgeable. Right, and are you suggesting that because they're skilled and knowledgeable, they knew exactly how to violate your client's Fifth Amendment rights? Because if that is what you're trying to say, you should just say it. That's what I'm trying to say. Okay, that's quite a heavy accusation. Yes, that is my position, that by making the reference to whether or not he's going to testify, if he wants him to testify, I do believe, as the court mentioned, there are several other ways that that objection could have been made, but that objection was not made that way. I don't think there was any reason for the prosecution to reference Mr. Mintz's right to testify in the speaking portion of that objection. I think as it relates to other cases that we have seen, whether it was inadvertent or not, Fox versus Mann, wherein when that happened the following morning, the court gave a curative instruction, we didn't see that here. I understand that the court admonished the prosecution. I'm sorry, was such a curative instruction requested by the defense? It was not, but I believe that the nature of the statement was such that a curative instruction was warranted nonetheless, Sean. I understand, I see. So that was my position there. As it relates to the loss amount, as I said- So it's your position that that question forced your client's decision? Or compelled him to testify. Pardon? Compelled him to testify. And the record evidence that would support that is essentially, if I'm understanding correctly, is essentially just the question itself. Yes, Your Honor. That is correct. But again, if at that point your client had felt he was prejudiced by that, he could have also asked for a curative instruction, as was given in Mann. I do agree, Your Honor. Which we have held was adequate to protect a defendant's rights. So as a matter of law, any decision on your client's part to think that he was compelled, that the only way to cure it, would have been incorrect. Yes, Your Honor, I do believe that a curative instruction could have been requested at that point. I think- So he was not, in fact, compelled to testify. You're limited to arguing that he incorrectly felt compelled to testify. That would be a more accurate statement, Your Honor. Okay. I see that my time, I've actually gone over my time. I was going to speak to the loss amount, but I do believe in just in my opening, I was speaking to that very briefly as it relates to the identity, the fact that only seven parents testified in the case versus the 1,250 plus instances where Mr. Mensa was, the loss amount was calculated based upon whether he was on the phone for more than 15 minutes. Whether his vehicle had not entered into New York or was elsewhere within New York. But only two instances, on August 18th and 24th, was Mr. Mensa actually observed or surveilled at any point. Thank you. Good morning, your honors, and may it please the court. My name is Anthony Bagnola. I'm an assistant United States attorney in the Eastern District of New York, and I was one of the trial lawyers for the government below. The record of this case makes clear that Enoch Mensa received a fair trial in all respects. As to the first two issues he raises on appeal regarding juror bias and prosecutorial misconduct, the record is clear that the district court acted reasonably and appropriately under the circumstances. And its rulings are comfortably located within the bounds of Judge Johnson's sound discretion. As to his guidelines challenge, Mr. Mensa asks this court to find that he was erroneously deprived of something he never asked for. And at sentencing, affirmatively declined. Begin first with juror bias, since that's where my friend Mr. Washington began. The cases make clear that investigating juror bias is not a technical conception, and the constitution requires no particular test or procedure. In this case, Judge Johnson had what this court in Nieves called nearly limitless discretion to determine what was necessary, and through his questioning, he elicited what the government submits are the two most salient data points to this analysis. When separately questioned, both men stated there was no relationship between them. That's at appendix 342 to 343 for Agent Cecilio, and appendix 345 for juror number six. And second, juror number six stated he was 100% certain that he could remain fair and impartial. That's at appendix 345. The government submits. It would be hard for me to imagine a juror saying no, I can't. I mean, no, it's not hard to imagine jurors say it sometimes, but I'm just trying to figure out whether that's enough to elicit. You don't have to have a, if somebody very close to you has a very close relationship with somebody, then just because you don't have a direct relationship with that person. I'm just imagining it would feel hard to conclude that that person was lying, which is really the question here. Would you feel uncomfortable concluding that this person was lying? Would it be more likely to elicit a thoughtful response from the juror if the court had asked a question like that? It's a very fair question, Judge Robinson. Two things I'd like to say in response. The first is that this discussion of whether it was a relationship or something else, I think matters here because I would submit that Judge Johnson's mode of questioning was calibrated to account for what information was known at the time. Not that there was some direct history or direct association between these two men, but that the juror's sister was once friends with a woman who later married a single government witness. I think under those circumstances, it was perfectly reasonable for Judge Johnson to limit his questions, and again, efficiently elicit the two most salient data points the judge could have possibly had, as Judge Nardini noted. Any further questioning would have went to the point of whether there was a relationship, and both men separately, in response to the judge's questioning, said there was not. The second thing I'd like to say, Judge Robinson, if I may, is just that the abuse of discretion standard contemplates a continuum of reasonableness. And so I submit that the question for this court is not necessarily whether it would have been prudent or best practice, or even whether the members of this panel in their own experience might have felt that more questions would have been appropriate, or whether some unspecified further voir dire would have potentially yielded a more thoughtful, as your Honor put it, response. The question is whether Judge Johnson's decision to proceed the way he did constitutes an abuse of his discretion. And I think even if there's a difference of opinion between reasonable jurists on that question, there is not a basis on this record to find that Judge Johnson acted outside of or abused his discretion in conducting the questioning exactly the way he did. Could you turn to the second point, the question about the objection by the prosecutor, and I guess let me just lead off. I mean, do you agree that as formulated by the prosecutor, that was an improper way to object? Absolutely, your Honor. In the government's brief, we have not made an argument to suggest otherwise. I would say at the outset, though, that an improper remark, as my friend concedes in his brief, alone is not enough to reverse a conviction in an otherwise fair proceeding. As Judge Johnson held in denying Mr. Mensa's Rule 33 motion on this ground, any prejudice was bound to be limited, and I'll offer the court three independent reasons why. First, the district judge made clear through his conduct that the speaking portion of this objection was not to be considered. Halfway through the challenge statement, Judge Johnson forcefully said the word no five times, followed by the word overruled, that's at Appendix 713. He did that before the prosecutor could finish his thought, or before defense counsel could say anything of his own. And I would submit to the court that that reaction in and of itself had a curative effect on what the jury reasonably believed they could consider. Two, and this is something that requires a little bit of digging into the record, the judge held a charge conference after this remark was made, but before Mr. Mensa decided to testify. And at that charge conference, at which Mr. Mensa was present, the judge told him what he planned to tell the jury in his closing charge. And among other things he told Mr. Mensa, I plan to tell the jury this, quote, the law does not impose a defendant in a criminal case the burden or duty of calling any witness or producing any evidence. That is because the burden of proof is always, burden of proof at all times remains with the government. So I think that undermines the suggestion that Mr. Mensa somehow was misled or coerced into believing that the jury might infer from his silence that he was guilty. Third, Judge Johnson not only gave that general instruction at the end of the trial. In addition, he gave a specific instruction that the defendant in a criminal case never has any duty to testify or come forward with any evidence. In this case, the defendant did testify and was subject to cross-examination like any other witness. You should examine and evaluate the testimony just as you would the testimony of any other witness. That's at appendix 912 to 913. There is long standing presumption that jurors will follow instructions that are given to them, absent evidence to the contrary, here there is none and I would respectfully submit Judge Nardini, there is no basis on this record to conclude that the jury ignored that instruction or otherwise was misled into drawing an adverse inference from Mr. Mensa's decision or ability to remain silent, I should say. Could you address counsel's other argument, however, that once the comment was made that Mr. Mensa effectively felt compelled or coerced to testify? Yes, I can, Judge. Initially, I would like to just address the fact that sort of adjacent to this analysis is a harmlessness problem. And so in evaluating the prejudicial or allegedly prejudicial effect of this statement on Mr. Mensa, the district court and the lower court were required to evaluate it in the context of the trial as a whole. That's what this court said in United States v. Thomas, a 2004 decision. And as the government's brief lays out in great detail, the evidence of Mr. Mensa's guilt was frankly overwhelming. The district court found as much in denying Rule 29 relief, calling Mr. Mensa's sufficiency argument, quote, completely without merit, close quote. Based on the quote, vast amount of evidence corroborating guilt in the record, close quote. That's at appendix 1367. And so again, I would respectfully submit that against the backdrop of all of the evidence of Mr. Mensa's guilt, the record does not permit an inference that substantial prejudice attached to this sentence fragment offered inartfully by one of the prosecutors. That being said, I do not believe that this statement, standing alone or otherwise, can reasonably be found to rise to the level of coercion or compulsion. And although Mr. Mensa, he did challenge the prosecutor's remark in the district court, he never before said that he felt compelled to testify until he filed this appeal. And in fact, in denying his Rule 33 motion, Judge Johnson specifically noted that Mensa couldn't show prejudice because he hadn't even alleged that the prosecutor's remark played any role in his decision to testify. That's at appendix 1371. And so I would suggest, Judge Nardini, that the suggestion raised in the instant appeal that Mr. Mensa felt veritably forced to testify in way of his Fifth Amendment rights is conclusively contradicted by the record below, in which not only did he not make that argument favoring Rule 33 relief, but the judge found it a notable lack of proof in his ability to meet the Rule 33 standard. Could you briefly address the sentencing issue, the combination of the license plate reader and the cell phone data and the 15 minutes. Yes, of course. Together is not adequate to support the loss calculation. Yes, Your Honor, and I'd like- The sentencing range, rather. Forgive me. I'd like to start by pointing out that we are, with respect to this point, under a plain error standard precisely because this issue was not raised to the sentencing judge or to the trial judge. But more to the heart of Your Honor's point, I submit it misstates the evidence to suggest that Natalie Lynn, that was the government's summary witness, relied on the presence of Mr. Mensa's car alone, as was suggested in the reply brief. As explained in the government's brief at pages 23 to 30, the LPR, or license plate reader data, was one metric alongside cell phone records, physical surveillance, and the defendant's own incriminating text messages that made clear he was not performing the work for which he sought and received payment from Medicaid and the New York City Department of Health and Mental Hygiene. All this evidence was aggregated and compared, as is typical of a summary witness, and Ms. Lynn drew conclusions about the likelihood. That's all she could do. She drew conclusions about the likelihood that Mr. Mensa's session notes contradicting that evidence were truthful. I started by reminding the court that we are in plain error land here, because none of that was controverted. The evidence underlying the summary witness's conclusions was never disputed. Defense counsel argued to the jury in summation that certain conclusions she drew were not reliable. But all that means is that that was all in the record before the sentencing judge when Mr. Mensa came up for sentencing and this ten point enhancement was applied. At sentencing, Mr. Mensa didn't object to the PSR, which relied on Ms. Lynn's analysis. He never objected to the guidelines calculation or requested a Fatico hearing. And when the sentencing judge asked him if he, quote, had anything to say about the guideline calculation, close quote, before sentencing was imposed, he said no. In fact, the court recited the ten point enhancement among other findings of fact. And defense counsel replied, quote, that's correct, your honor, close quote, that's at appendix 1456. Thank you. We'll hear rebuttal. Just very briefly, if I may, specifically to the loss amount, and I understand that we are in a plain error standard. But I do just want to note that, as counsel noted, the LPR information is supported by physical surveillance, phone records, and text messages. I think the court will find that there were only two dates that there was actual physical surveillance of the 1,269 or so times that were calculated based upon Ms. Lynn's determinations, as well as five specific dates that were supported by text messages. I understand that we're at a plain error standard here, but the concern is that you have multiple, multiple dates where you have no identification of Mr. Mensa whatsoever. Once you've got your direct observation and you see that this is something that he does or has done on some occasions, doesn't that make it a lot easier to get to a preponderance standard by evidence that his phone isn't there and or his car isn't there when he's supposed to be here? Well, I think it could. I think it could, but we also have testimony from Mr. Mensa that he did not exclusively use his car to meet with the clients. The other issue that we have is if we're relating it specifically to a cell phone, I think it does become a bit more speculative, because we don't know the nature of the call that is being placed at the time that we're saying Mr. Mensa was on the phone for 15 minutes during a time that he was supposed to have been with one of his clients. Particularly when we even have testimony from the clients that Mr. Mensa did assist them in reaching out to other people and obtaining services. We don't have any geolocation records as to what he was doing at that particular time. So I do think in that regard, we do fall below the preponderance of the evidence standard as it relates to a large portion of the loss amount, the overwhelming portion of that loss amount. Can I ask you just one question to clarify about the state of the record below? Yes, sir. Your opponent referenced Judge Johnson's ruling, I think it was the one denying the Rule 33 motion, where he said that the defendant had not argued that his decision to testify had been motivated in any way by the prosecutor's comment. Was that accurate, or was that argument raised below? And if so, could you point to where that was? No, Your Honor, that argument was not raised below. That's helpful, thank you. That argument was not raised below. Thank you. Thank you both, well argued, and we'll take the matter under advisement.